IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALAN FREE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:05-cv-0713 |
| | ) |
| JO ANNE  B. BARNHART, | ) Judge Thomas M. Hardiman |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

### I.    **Introduction**

Plaintiff Alan Free (Free) brings this action pursuant to 42 U.S.C. §405(g) and

§1383(c)(3) of the Social Security Act (Act), seeking review of the final determination of the

Commissioner of Social Security (Commissioner) denying his application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI). This matter is before the

Court on the parties' cross motions for summary judgment under Rule 56 of the Federal Rules of

Civil Procedure based on the record developed at the administrative proceedings.

After careful consideration of the Administrative Law Judge's (ALJ's) decision, the

memoranda of the parties and the entire record, the Court finds the ALJ's decision is supported

by substantial evidence. Therefore, the Court will deny Plaintiff's motion for summary judgment

and affirm the determination by the Commissioner.

## II.    Procedural History

Plaintiff applied for DIB and SSI on October 21, 2002, claiming disability as of November 26, 2000, because of high blood pressure, sleep apnea, gout, carpal tunnel syndrome, arthritis, status post broken right ankle, depression, and obesity. (R. 110-12, 128, 499-502). After Plaintiff's administrative appeals were denied, he requested a hearing before an ALJ which was held on January 28, 2004 at which Plaintiff testified and was represented by counsel. (R. 42-78). In an opinion dated May 21, 2004, ALJ James Bukes found that although Plaintiff Free suffered from severe impairments, he was able to perform a reduced range of unskilled, light work. (R. 15-29). The Appeals Council denied Free's request for review on March 25, 2005, rendering the ALJ's decision the final decision of the Commissioner. (R. 8-10, 13, 14).

## III.   Facts

Plaintiff Free was 43 years of age at the time of the ALJ's decision, making him a "younger person" under the regulations. 20 C.F.R. §404.1563. Free has a high school diploma and has worked in the past as a welder, maintenance welder, and steel crane operator. (R. 19, 46, 73). He claims that he became disabled on November 26, 2001 when he stopped working because of severe pain in his right hamstring and a major depressive disorder. (R. 128).

### A. Physical Impairments

The record indicates that Free's physical problems began in 1989 when he tore his right hamstring while speed skating. (R. 364, 392). During 2001, Free was treated for pain and cramping and a March 2001 MRI confirmed a chronic tear of his hamstring muscles. (R. 67, 203-05, 217, 362-64, 389-92). On February 12, 2002, Free underwent surgery to repair his right hamstring. (R. 217, 352-53). Free's wounds were healed within two weeks and he reported

2

significant improvement in his condition eight months after his surgery. (R. 356-61).

In September and October 2001, Free underwent overnight polysomnography testing at the Butler Memorial Hospital Center for Sleep Disorders and was diagnosed with obstructive sleep apnea and was prescribed a CPAP machine. (R. 218-21, 223-24). On October 28, 2001, Free's CPAP was increased because his sleep apnea was not under control. (R. 222).

On March 6, 2002, Free presented at the emergency room because of right ankle pain. (R. 238-43). An x-ray indicated mild soft tissue swelling and Free was given a splint and medication. (R. 241). Subsequent x-rays showed no new fracture. (R. 249). Some eight months later, Free returned because of right ankle pain, but his x-rays were normal. (R. 312-16, 387).

In June 2002, Free reported left elbow pain and surgeon Mark Baratz diagnosed early degenerative joint disease. (R. 365). Although Dr. Baratz discussed treatment options, Free believed he was not sufficiently symptomatic to pursue treatment. (R. 365). In December 2002, a CT scan of Free's left elbow showed degenerative arthrosis with no loose bodies or fractures. (R. 396). On August 21, 2003, Free was informed by Michael Rogal, M.D. that he had severe degenerative arthritis in his left elbow joint, but he was not a candidate for surgery. (R. 461).

On October 3, 2003, Free consulted with Michael Brit, M.D., for stiffness in his left elbow, left hand and lower back. (R. 469). Upon examination, Free's reflexes were 3+ in his legs and 2+ in his arms. (R. 470). He had good range of motion in his shoulders and good flexion and extension in his wrists with good hand grip. (R. 470). He had limited extension in his left elbow but good flexion and extension in his right elbow. (R. 470). Despite some mild tenderness to touch in his cervical spine, he had good flexion, extension and rotation. (R. 470). His strength was 5/5 in his right arm and left leg and 4/5 in his left arm and right leg. (R. 470).

3

There was swelling in his right wrists and hands but no inflammation, redness or synovitis of any joint. (R. 470). Dr. Brit assessed gout, which was not flaring, and osteoarthritis of the left elbow. (R. 470). The following month, Dr. Brit reported that Free had 5/5 muscle strength, full and symmetrical peripheral pulses, no joint synovitis and a nonfocal neurological examination. (R. 468).[1]

On August 21, 2001, Dennis Demby, M.D. performed a consultative examination of Free at the state agency's request. (R. 181-185). Dr. Demby found that Free had no physical, postural or environmental limitations, except that he should not stand or walk quickly over an extended period. (R. 184-85). On January 8, 2003, at the state agency's request, Free's primary care physician, Dr. Evanko, performed a consultative examination. (R. 397-400). At that time, Free reported that his major medical problem was his right hamstring injury, which required him to wear a TENS unit. (R. 397). Free told Dr. Evanko that he gets help with his activities of daily living; he can walk 200 feet before resting, and can stand for ten minutes. (R. 397). Dr. Evanko found no abnormalities in Free's extremities, normal range of motion in all joints and no cyanosis, clubbing or joint inflammation. (R. 399). Although Free had some tenderness in his right hamstring, he had no problems getting on or off the examination table, no problems dressing, his gait was normal, and there was no evidence of acute gout. (R. 399).

---

[1]       Free also suffered from hip, left toe, right arm, and back problems. In 2001 he participated in physical therapy for his left hip pain. (R. 168-69). Although an MRI of his left hip in September 2001 was negative, (R. 213), Free attended chiropractic treatment periodically through November 2002 and responded favorably. (R. 382-85). On April 16, 2002, Free presented to the emergency room with left toe pain. (R. 250-56). He was diagnosed with acute gout, was treated, and by October 2002, this condition was stable. (R. 293). On October 25, 2002, Free underwent electrodiagnostic and nerve conduction studies of the right arm which revealed mild to moderate carpal tunnel syndrome and mild to moderate tennis elbow. (R. 300-02). His physician recommended conservative treatment. (R. 302). On January 4, 2004, lumbar spine x-rays showed mild degenerative changes of the lumbar vertebrae. (R. 482). Accordingly, Free began physical therapy on January 12, 2004. (R. 492-93). Although he could not take anti-inflammatory medication or aspirin because of his gastric bypass surgery on December 5, 2003, Free was able to take Tylenol for pain. (R. 430-33, 434, 436-37, 483-93, 498).

4

## B.    Mental Impairments

The record indicates that Free was treated for depression by Dr. Evanko, who prescribed
him medication until August 27, 2001, when he attempted suicide by overdose after his girlfriend
threatened to leave him.  (R. 186-200, 336-47).  Free was diagnosed with brief depressive
reaction and narcissistic personality, and was discharged the next day with a global assessment of
functioning (GAF) of 55.  (R. 193-94).  Free then began counseling and psychiatric treatment at
Irene Stacy Mental Health Center with C. Bryan Norton, M.D., a psychiatrist, and therapist Jan
Hines, M.A.  (R. 368).

In December 2001, Dr. Norton reported that although Free complained about the
inadequacy of his medical treatment, he sought more medical intervention.  (R. 380).  In response
to Free's complaints of sleep problems, Dr. Norton adjusted his medications.  (R. 380).  The next
month, Free reported that he was doing much better and both his sleep and mood had improved.
(R. 379).

On April 19, 2002, Dr. Norton stated that although Free remained consumed with his
physical issues, his mood was lighter and he seemed to be coping fairly well.  (R. 378).  Four
months later, Dr. Norton reported that Free was maintaining fairly good condition and had little
distress in the form of depression or anxiety, despite being consumed with his various physical
problems.  (R. 377).  On November 14, 2002, Dr. Norton reported that Free's physical problems,
surgeries and treatment resembled a Munchausen's Syndrome, which is a condition characterized
by habitual presentation for hospital treatment of an apparent acute physical illness based on a
plausible, but false history.  (R. 375); *Dorland's Illustrated Medical Dictionary* 1762 (29th ed.
2000).  That same month, in a report requested by the state agency, Dr. Norton described Free's

5

mental status as good, with appropriate affect, good appropriateness, average intelligence and good to fair concentration, although his mood was slightly depressed. (R. 369). Moreover, Free revealed no evidence of disordered thinking, suicidal or homicidal ideations or delusions, and was fully oriented with good to fair memory. (R. 360). He had poor to fair impulse control and social judgment, but good test judgment. (R. 370). Dr. Norton found that Free did not have panic attacks and he found that Free's mental impairments did not impair his ability to perform daily activities, function socially, or maintain concentration, persistence, or pace. (R. 368-74).

On February 3, 2003, state agency psychologist Raymond Dalton, Ph.D., concluded that Free's mental impairments caused no restriction in his ability to perform activities of daily living or maintain social functioning, concentration, persistence or pace. (R. 401-15).

On April 18, 2003, Dr. Norton noted that Free had a distinctly dysphoric mood and reported increased panic attacks and anxiety, so he prescribed an anti-depressant. (R. 458). The following month, Free's mood had improved, he was tolerating his medication well, and he seemed proud of the number of surgeries he was having. (R. 457).

On June 25, 2003, Dr. Norton and therapist Hines concluded that Free had "fair" abilities with regard to most work-related mental activities. (R. 459-60). They also found his abilities to be "fair" to "poor/none" with regard to interacting with supervisors, dealing with work stresses, maintaining attention/concentration and understanding, remembering and carrying out complex job instructions. (R. 459). They found he had "good" to "fair" ability to understand, remember and carry out simple job instructions. (R. 459). Finally, Free's GAF was 53 at that time and his highest GAF over the past year was 60. (R. 460).

Free spent the first three days of October 2003 in the hospital after a meeting with his ex-

6

girlfriend prompted him to overdose on prescription medications. (R. 447-48, 463-66). He told his attending physician that he keeps active by regularly playing a musical instrument at his church and he insisted on being discharged in order to attend a concert. (R. 463-66). Free was in good condition when he left the hospital, with intact cognition and memory and fair judgment.

(R. 464).

Free returned to Dr. Norton on October 20, 2003 for a medication check. (R. 475-76). Dr. Norton noted that Free's mood was generally brighter and more spontaneous than in the past. (R. 475). His affective expression showed good spontaneity with appropriate range and responsiveness and his thought process was well-organized. (R. 475).

During the hearing, the ALJ asked vocational expert Dr. William Houston Reed whether jobs were available for a younger individual with a high school education who had the following restrictions: lift and carry twenty pounds occasionally and ten pounds frequently; occasionally climb, balance, stoop, kneel, crouch or crawl; avoid rapid movements and fine manipulation with the left, non-dominate hand; avoid complex instructions, work setting changes, groups of people, contact with the general public, proximity to co-workers, decision making and intensive supervision. (R. 73-74). The VE concluded that Free could perform unskilled light work as a stock/inventory clerk (80,682 jobs nationally), traffic shipping and receiving clerk (78,711 jobs nationally), and a hand packer (215,389 jobs nationally). (R. 74-75).

## IV. Standards of Review

Judicial review of the Commissioner's final decision on disability claims is provided by

7

42 U.S.C. §§ 405(g)[2] and 1383(c)(3).[3]  Section 405(g) permits a district court to review

transcripts and records upon which a determination of the Commissioner is based.  Because the

standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review

thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f,

regarding Supplemental Security Income, or "SSI"), disability decisions rendered under Title II

are pertinent to those rendered under Title XVI. *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3

(1990).

    If supported by substantial evidence, the Commissioner's factual findings must be

accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v.

Secretary of HHS,* 722 F.2d 1150, 1152 (3d Cir. 1983).  The district court's function is to

determine whether the record, *as a whole*, contains substantial evidence to support the

Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994), *citing

Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Supreme Court has explained that

"substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Ventura*, 55 F.3d

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he
> was a party, irrespective of the amount in controversy, may obtain a review of such decision by a
> civil action . . . brought in the district court of the United States for the judicial district in which the
> plaintiff resides, or has his principal place of business . . . .

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1)
> shall be subject to judicial review as provided in section 405(g) of this title to the same extent as
> the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

at 901 *quoting Richardson*; *Stunkard v. Secretary of the Dep't of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988). The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).

In making this determination, the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massanari,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87"; parallel and other citations omitted).

An ALJ must do more than simply state factual conclusions, but instead must make

9

specific findings of fact to support the ultimate findings. *Stewart*, 714 F.2d at 290. In making a determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain the reasons for rejecting such supporting evidence, especially when testimony of the claimant's treating physician is rejected. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician: "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports" and other objective medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

To demonstrate disability under Title II or Title XVI of the Act, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423 (d)(1); 42 U.S.C. §1383c(a)(3)(A). When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the Commissioner applies a five-step analysis. 20 C.F.R. §§404.1520 and 416.920 (1995). *See Sullivan*, 493 U.S. at 525. The United States Court of Appeals for the Third Circuit summarized this five step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999) as follows:

In *step one*, the Commissioner must determine whether the claimant is

10

currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied . . . . In *step two*, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In *step three*, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Step four* requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work . . . .

If the claimant is unable to resume her former occupation, the evaluation moves to the final *step [five]*. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ *must analyze the cumulative effect of all the claimant's impairments* in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step . . . .

*Plummer*, 186 F.3d at 428 (emphasis added; certain citations omitted).

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to

qualify for benefits in one of two ways:

(1) by introducing medical evidence that the claimant is disabled *per se* because he or she

meets the criteria for one or more of a number of serious Listed Impairments delineated in

20 C.F.R. No. 4, Subpt. P, Appendix 1, or that the impairment is *equivalent* to a Listed

Impairment. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Stunkard*, 841 F.2d at 59;

*Kangas*, 823 F.2d at 777 (Steps 1-3); or,

11

(2) in the event that claimant suffers from a less severe impairment, he or she will be deemed disabled where the claimant is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461, *citing* 42 U.S.C. §423 (d)(2)(A). In order to prove disability under this second method, claimant first must demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4). *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Campbell*, 461 U.S. at 461; *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Burnett*, 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the '[Commissioner] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity'"), *citing* 42 U.S.C. §423(d)(2)(C), and 20 C.F.R. §§404.1523, 416.923.

Section 404.1523, Multiple impairments, provides:

12

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see §404.1520).

Thus, when a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the [Commissioner] denies the payment of disability benefits." *Bittel,* 441 F.2d at 1195. Even if a claimant's impairment does not meet the criteria specified in the listings, he must be found disabled if his condition is *equivalent* to a listed impairment. 20 C.F.R. § 404.1520(d) (2002). To that end, the ALJ may not just make conclusory statements that the impairments do not equal a Listed Impairment in combination or alone, but rather, is required to set forth the reasons for the decision, and specifically explain why a claimant's impairments did not, alone or in combination, equal in severity one of the Listed Impairments. *Fargnoli,* 247 F.3d at 40 n.4, *citing Burnett*, 220 F.3d at 119-20.

If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to past employment or perform substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [believed necessary] to make a sound determination." *Ferguson*, 765 F.2d at 36.

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65 (3d Cir. 1987), *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403,

13

409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999). When a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. This evaluation obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. §404.1529(c) (2002). *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in the decision. *See Cotter*, 642 F.2d at 705. The United States Court of Appeals for the Third Circuit has stated: "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433, *quoting* Social Security Ruling ("SSR") 95-5p.

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195. Although "there must be objective medical evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749

14

F.2d at 1070-71, *quoted in Mason,* 994 F.2d at 1067. Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount claimant's pain without contrary medical evidence. *Ferguson,* 765 F.2d at 37; *Chrupcala v. Heckler,* 829 F.2d 1269, 1275-76 (3d Cir. 1987). "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence. Instead, the Secretary must present *evidence to refute the claim. See Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981).

## V.   Analysis

### A.   Medical Opinions of Treating Sources

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer,* 186 F.3d at 429 (*quoting Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)) . . . ." *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). The ALJ must weigh conflicting medical evidence and can choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id*. at 317, *quoting Plummer,* 186 F.3d at 429 (additional citations omitted). The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory, medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion. *Morales,* 225 F.3d at 317-318 (citations omitted).

Moreover, the Commissioner/ALJ "must 'explicitly' weigh all relevant, probative and

15

available evidence . . . [and] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition . . . . The [Commissioner] may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects." *Adorno*, 40 F.3d at 48 (citations omitted). *See also Fargnoli*, 247 F.3d at 42-43 (when the ALJ failed to mention significant contradictory evidence or findings, Court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving Court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit . . . .").

However, a medical statement or opinion expressed by a treating source on a matter reserved for the Commissioner, such as the claimant is "disabled" or "unable to work," is not dispositive or controlling. *Adorno*, 40 F.3d at 47-48, *citing Wright v. Sulllivan*, 900 F.2d 675, 683 (3d Cir. 1990) ("this type of [medical] conclusion cannot be controlling. 20 C.F.R. §404.1527 (1989) indicates that [a] statement by your physician that you are disabled or unable to work does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that you are disabled.") (internal citations omitted).

The rules and regulations of the Commissioner and the SSA make a distinction between (i) medical opinions about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and physical or mental restrictions, on the one hand, and (ii) medical opinions on matters reserved for the Commissioner, such as "disabled" or "unable to work," on the other. The latter type of medical opinions are on matters which require dispositive administrative findings that would

16

direct a determination of disability. *Compare* 20 C.F.R. §404.1527(a-d) (2002) (consideration and weighing of medical opinions) *with* 20 C.F.R. §404.1527(e) (2002) (distinguishing medical opinions on matters reserved for the Commissioner).

The regulations state that the SSA will "always consider medical opinions in your case record," and state the circumstances in which an opinion of a treating source is entitled to "controlling weight." 20 C.F.R. §404.1527(b), (d) (2002).[4] Medical opinions on matters reserved for the Commissioner are not entitled to "any special significance," although they always must be considered. 20 C.F.R. §404.1527(e)(1-2) (2002). The Commissioner's Social Security Ruling ("SSR") 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Policy Interpretation Ruling, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," explain in some detail the distinction between medical opinions entitled to controlling weight and those reserved to the Commissioner.

SSR 96-2p explains that a "finding that a treating source's medical opinion is not entitled

---

[4] Subsection (d) states: "How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider [a list of] factors in deciding the weight we give to any medical opinion." 20 C.F.R. §404.1527(d) (2002). Subsection (d)(2) describes the treatment relationship," and states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, *we will give it controlling weight.* When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. *We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.*

20 C.F.R. §404.1527(d)(2) (2002) (emphasis added).

17

to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-29, Purpose No. 7. Where a medical opinion is not entitled to controlling weight or special significance because it is on an issue reserved for the Commissioner,[5] these Social Security Rulings require that, because an adjudicator is required to evaluate all evidence in the record that may bear on the determination or decision of disability, "adjudicators must always carefully consider medical source opinions about any issue, including opinions about those issues that are reserved to the Commissioner," and that such opinions "must never be ignored . . . ." SSR 96-5p, Policy Interpretation. Moreover, because the treating source's opinion and other evidence is "important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Id.*

Finally, a medical opinion is not entitled to controlling weight if it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527 (d)(2). *See* note 3, *supra*. Where an opinion by a medical source is not entitled to controlling weight, the following factors are to be considered: the examining relationship, the treatment relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization and other miscellaneous factors. 20 C.F.R. § 404.1527 (d)(1-6).

---

[5] SSR 96-5p lists several examples of such issues, including whether an individual's impairment(s) meets or equals in severity a Listed Impairment, what an individual's RFC is and whether that RFC prevents him or her from returning to past relevant work, and whether an individual is "disabled" under the Act.

18

B.      State Agency Consultants

Medical consultants of a state agency who evaluate a claimant based upon a review of the

medical record "are highly qualified physicians and psychologists who are also experts in Social

Security disability evaluation. Therefore, administrative law judges must consider findings of

State agency medical . . . consultants or other program physicians . . . as opinion evidence, except

for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 404.1527

(f)(2)(i). *See also* SSR 96-6p: Titles II and XVI: Consideration of Administrative Findings of

Fact by State Agency Medical and Psychological Consultants ("1.  Findings of fact made by State

agency medical and psychological consultants and other program physicians and psychologists

regarding the nature and severity of an individual's impairment(s) must be treated as expert

opinion evidence of nonexamining sources at the administrative law judge and Appeals Council

levels of administrative review.  2.  Administrative law judges and the Appeals Council may not

ignore these opinions and must explain the weight given to these opinions in their decisions.").

C.      Application

Plaintiff raises three interrelated points of error in this appeal.  The gravamen of Free's

argument is that the ALJ erred when he found that Free had the RFC to perform a significant

range of light work because that conclusion was based on a defective hypothetical question to the

VE.  Instead, Free claims that he is limited to sedentary work because he cannot perform the

walking, standing, or lifting required by light exertional work.  (Pl. Br. at 11-15). He also claims

the ALJ erred when he failed to find that Free has a poor ability to demonstrate reliability.  (Pl.

Br. at 12).  Because the law is clear that an ALJ's hypothetical question to a VE need only

include a claimant's credibly established limitations, *Rutherford v. Barnhart*, 399 F.3d 546, 554

(3d Cir. 2005), the question in this case, as in many social security cases, is whether the ALJ was

required to find the limitations proffered by the claimant in light of the medical evidence of record.

In support of his argument that he is limited to sedentary work, Free relies on the consultative evaluation of Dr. Evanko on January 8, 2003 in which Dr. Evanko allegedly opined that Free cannot stand or walk to the extent required for light work. (Pl. Br. at 14). A careful review of Dr. Evanko's report belies this assertion, however. In fact, Dr. Evanko's report placed no functional limitations on Free and documented fairly benign results. It is true that in the history section of his report, Dr. Evanko stated: "[h]e can walk 200 feet before he must rest due to pain or spasm, and he can stand for 10 minutes." (R. 397). There is no evidence, however, that Dr. Evanko tested or observed Free's ability to walk over distance or stand for any length of time. Rather, the aforementioned quotation is consistent with Free's self-reported limitations, which do not become clinical medical evidence simply because they are found in a physician's report. *See* 20 C.F.R. §404.1528(a).

Even had Dr. Evanko tested Free's ability to stand and walk and made such findings, the Commissioner correctly notes that the medical evidence and the conclusions of other physicians were contrary to Dr. Evanko's conclusions. For example, in August 2001, consultative examiner Dr. Demby found that Free had no physical, postural or environmental limitations except that he could not stand or walk quickly over extended periods. (R. 184-85). Consistent with this finding, state agency physician Dr. Newberg concluded in February 2003 that Free could perform light work with occasional postural limitations. (R. 416-25). The ALJ included these and other postural limitations related to Free's elbow problems in his RFC analysis and there is substantial evidence in the record to support the ALJ"s finding that Free could perform light work. (R. 28).

The Commissioner also correctly notes that although Free underwent several surgeries,

20

they were successful. After his hamstring surgery on February 12, 2002, Free reported significant improvement and experienced only mild and occasional cramping. (R. 356-60). In addition, his gout was stable by October 2002 and he reported no ongoing sleep apnea problems after adjustments were made to his CPAP. (R. 222-293).

In January 2003, Dr. Evanko noted that Free had normal range of motion in all of his joints, no abnormalities in his arms and legs and his gross sensory and motor examination was normal. (R. 399). Free had no problems getting on and off the examination table and his gait was normal. (R. 399). In October 2003, Dr. Brit reported that Free had good flexion, extension and rotation in his cervical spine and he had full strength in his right arm and left leg and 4/5 strength in his left arm and right leg. (R. 470). The following month Dr. Brit found full muscle strength and no joint synovitis. (R. 468). Thus, the medical evidence supports the ALJ's RFC assessment.

Like the foregoing analysis, Free's claim that the ALJ erroneously failed to include in his hypothetical question the fact that Free had a poor ability to demonstrate reliability finds no support in the record, as the ALJ properly noted. (R. 27, 75-76). In November 2002, Dr. Norton found that Free's impairments had no impact on his ability to perform daily activities, maintain social functioning, or maintain concentration, persistence, or pace. (R. 368-74). The same assessment was made by state agency psychologist Raymond Dalton, Ph.D. in February 2003. (R. 401-15). No mental health provider rated Free's ability to demonstrate reliability as "poor/none." (R. 460-478). In June 2003, Dr. Norton rated Free's ability to demonstrate reliability as "fair" and in January 2004 as "fair to poor." (R. 460-478). Accordingly, the ALJ did not err regarding Free's ability to demonstrate reliability.

## VI. Conclusion

The Court has reviewed the ALJ's findings of fact and decision and determines that his ruling is supported by substantial evidence. Accordingly, the Court will deny Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision below.

An appropriate order follows.

July 14, 2006

Thomas M. Hardiman
United States District Judge

22